# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| *Leonard S. Akin*, Plaintiff <br><br> v. <br><br> *American Builders and Contractors Supply Company, Inc.*, Defendant | **Civil Case Number: 4:21-cv-00214** |

## COMPLAINT WITH JURY DEMAND

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

Plaintiff Leonard S. Akin files this Complaint with jury demand against Defendant American Builders and Contractors Supply Company, Inc., *a/k/a* ABC Supply Company commonly referenced herein simply as "ABC" and alleges as follows:

### I.  JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship between Plaintiff who is a citizen of Texas and Defendant who is not a citizen of Texas and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interests and costs.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) since a substantial portion of the events giving rise to Plaintiffs' claims occurred in this District and Defendant ABC is deemed to reside in this District.[1]

---

[1] 28 U.S.C. §1391(c)(2).

## II.   PARTIES AND CITIZENSHIP

3. Plaintiff Leonard S. Akin (often referenced as "Akin") is an individual who works and resides and at all relevant times has worked and resided in Irving, Dallas County, Texas.

4. Defendant American Builders and Contractors Supply Company, Inc. is a corporation formed under the laws of the State of Delaware.  Its principal place of business is, and at all relevant times has been, in Beloit Wisconsin.  The terms "ABC," "ABC Supply" and "ABC Supply Company" all refer to this Defendant.

5. **American Builders and Contractors Supply Company, Inc. may be served with Summons and the Complaint by serving its registered agent, Corporation Service Company, by certified mail at 211 E. 7th St., Suite 620, Austin, TX 78701.**

6. For diversity purposes, Plaintiff Akin is a citizen of the State of Texas and Defendant ABC is not a citizen of Texas.  It is a citizen of Wisconsin and Delaware.  ABC has distribution centers throughout the State of Texas and meets any "minimum contacts" test.

## III.   SUMMARY

7. In this case Akin seeks to obtain: (i) a declaration under both the Texas Declaratory Judgments Act and the Federal Declaratory Judgments Act that an alleged personal guarantee of Akin for Highline's obligations to Defendant is void and (ii) Akin, as a creditor of Highline, is entitled to recover funds from ABC under the Texas Uniform Fraudulent Transfer Act ("TUFTA") because the payment of those funds by Highline for obligations not owed by Highline but by

L & M Roofing, a company unrelated to Highline, were fraudulent transfers under TUFTA.

## IV.  STATEMENT OF ALLEGED FACTS

### A.  FORMATION OF HIGHLINE ROOFING

8. In 2015 an individual named Mark Schwab (commonly referenced in this Complaint as "Schwab") approached Plaintiff Akin with a roof repair and installation business proposal

9. Prior to that time Akin and Schwab were close friends. Akin, however, was employed in the automobile industry and had an excellent compensation package. Consequently, Akin was reluctant to leave that industry and the security it offered.

10. Schwab explained to Akin that Schwab had the expertise and ability to manage the company, but Schwab could not own the proposed company because it would need credit, credit that Schwab believed he did not have because due to a personal bankruptcy Schwab had filed in the Eastern District of Texas,[2] that had resulted in significant financial losses to his creditors.

11. Schwab suggested that the "new" company would be a Texas limited liability company with two members, Mark Schwab's spouse Lynn Schwab and Akin. Each would own half of the LLC.

12. Schwab, however, would act (and in fact did act) as the general manager and manage Highline's finances including bank accounts and credit cards.

---

[2] Plaintiff has identified that case number as 05-48721.

13. Schwab's proposal which would need credit, would be owned by Akin and Schwab's spouse, Lynn Schwab.

14. Akin totally trusted his longtime friend Mark Schwab and Schwab made a good pitch about the income potential of the business and compensation plan to Akin. Under the proposal Akin's compensation included a salary ($1,500 per week) and health insurance. Highline would also pay Akin's monthly truck payments ($600 per month) since Akin's role in Highline would require him to visit construction job sites. Akin agreed to the proposal.

15. Akin became convinced that Schwab's proposal had merit and agreed to it.

16. Accordingly, "Highline Roofing and Construction, LLC" ("Highline") was formed on April 15, 2015 pursuant to Section 101.463 of the Texas Limited Liability Company Act with two members: Akin and Lynn Schwab, each owning 50% of Highline.

17. Highline remains a closely held limited liability company as that term is defined in Section 101.463 of the Texas Limited Liability Company Act. Akin and Lynn Schwab still own Highline, fifty percent (50%) each.

B. HIGHLINE'S AGREEMENT WITH DEFENDANT ABC

18. Based on information and belief, Mark Schwab contacted defendant ABC about becoming a roofing materials supplier to Highline with a substantial line of credit. That resulted in a credit agreement between ABC and Highline, a genuine copy of which is attached as page 2 to Exhibit A.

19. Exhibit A purports to show Plaintiff Akin as the sole owner of Highline and purports to be signed by him, neither of which is true.

20. Akin never was the sole owner of Highline and never signed the credit application and did not even know that document existed until late 2019.

21. As supported by Akin's declaration, Exhibit B attached, Akin's purported signature on Exhibit A was forged and Akin was totally unaware this document existed until late 2019.

22. Based on information and belief, Mark Schwab completed attached Exhibit A including forging Akin's signature.

23. Based on information and belief, Trent Feenker, ABC's manager of its Denton facility prepared or at least approved Highline's alleged credit application.

24. Based on information and belief, neither Feenker nor any other ABC representative has any personal knowledge that: (i) the signature on the guarantee purporting to be Akin's signature on the ABC credit application as "guarantor" was in fact Akin's signature or (ii) any reasonable basis for making that claim.

25. Defendant ABC promptly became Highline's primary supplier of roofing supplies and remained so until Highline ceased being an on-going business at the end of 2019.

C.  **THE FORMATION AND OPERATION OF "L & M ROOFING" BY THE SCHWABS**

26. In 2016 the Schwabs secretly and unbeknownst to Akin created a fictious entity they called "L & M Roofing."

27. A search of the Texas Secretary of State records reveals that the Schwabs never filed assumed name documents with the Texas Secretary of State as required by

Chapter 71 of the Texas Business and Commerce Code.[3]  In fact, the Secretary of States website indicates that "L & M" named companies were or are owned by individuals unrelated to this case.

28. Plaintiff alleges that the purpose of L & M was to defraud Highline and enrich the Schwabs.

### D.   L & M'S CREDIT APPLICATION WITH ABC

29. On or about September 28, 2016, Mark Schwab signed and submitted a credit application to ABC in Denton Texas (the ABC facility managed by Trent Feenker) in which Schwab claimed that L & M had been in operation since 2015 and it had estimated monthly purchases of $25,000 to $50,000.

30. The application listed the Schwab's home address as L & M Roofing's business address.

31. A genuine copy of L & M's credit application submitted to ABC is attached as Exhibit C.

32. To the best of Plaintiff's knowledge, the Schwabs never operated "L & M Roofing" prior to applying for credit with ABC and L & M had no credit history.

33. Nevertheless, ABC's Denton Texas store manager, Mr. Trent Feenker, agreed to extend substantial credit to L & M.[4]

---

[3] Under TB&C Code this failure is a Class A misdemeanor.

[4] Schwab may not have had the customary vendor/vendee relationship with Feenker.  Schwab told Akin that Mr. Feenker rented room or rooms in his home to Schwab's employees, including David Patrick.  Attached Exhibit F are copies of documents Plaintiff alleges evidence a relationship between Feenker and Schwab.  Those address on those documents [redacted]are Feenkers home address.

34. Based on information and belief L & M sold little or no product. It simply operated as a purchasing agent for Schwab and his other entities. The process was:(i) L & M would order product from ABC, (ii) ABC would direct ship the product to Schwab, one of Schwab's entities, or a customer of one of Schwab's entities, and, finally, (iii) Schwab would cause Highline to pay ABC for that product.[5]

35. Highline received no material benefit from the above described transaction. The only persons who benefitted from the were the Schwabs, entities wholly owned by the Schwabs, the customers of those entities and ABC.

36. Neither Schwab nor ABC disclosed to Akin that Schwab was the principal behind L & M, although ABC knew of this fact from the opening of the L & M account with ABC.

37. Akin first discovered this about November 2018 and began investigating. His investigation included contacting ABC's Trent Feenker about getting information on L & M, but Mr. Feenker advised Akin that Akin was not authorized to see those records and refused to produce them.

E. **HIGHLINE'S PAYMENTS TO ABC FOR ABC'S SALES TO L & M ROOFING**

38. During years 2017, 2018 and 2019 Highline paid ABC not less than $140,000 for purchases made by L & M but paid for by Highline.

---

[5] Typically, Schwab would use pay ABC via Schwab's American Express card and then cause Highline pay the AMEX invoice. On other occasions, Schwab would cause Highline to pay ABC for L & M's purchases by check payable to ABC. L & M did not reimburse Highline for these payments.

39. Highline received no or inconsequential benefit from such payments because they did not represent supplies sold or delivered to Highline.

40. At the time of such payments Highline was not paying its bills in the normal course of business as they became due.

41. Attached Exhibit D, incorporated herein, details by invoice date, the invoices paid by Highline for materials purchased by L & M from ABC, payments that Highline contends were fraudulent transfers of Highline's funds at a time when Highline was insolvent as that term is defined in TUFTA.

42. Attached Exhibit E, incorporated herein, details total payments made by Highline to ABC for sales made by ABC to both Highline and L & M Roofing.  Since these invoices clump payments for both L & M product Highline has not been able to determine exactly how ABC allocated Highline's payments between L & M invoices and Highline's invoices.

43. Such payments to ABC for product sold to L & M were made at a time when Highline was insolvent as that term is defined in the Texas Uniform Fraudulent Transfer Act ("TUFTA").

44. At the time of the payments for sales evidenced by attached Exhibit D, Highline was not only insolvent, but Plaintiff Akin, a creditor of Highline, was owed past due compensation and reimbursable expenses more than the amounts paid to ABC and Highline to this day owes him for those unpaid sums.

45. With respect to payments made when Highline was not insolvent as that term is used in TUFTA, if any, Highline alleges that because of such payments Highline became insolvent as that term is defined under TUFTA.

### F. HIGHLINE'S INSOLVENCY

46. One objective, and possibly the only objective, of L & M was to unlawfully divert funds from Highline to the Schwabs or their wholly owned companies.

47. Since Mark Schwab controlled the finances of both L & M and Highline and Akin had no access to most of those records, Schwab was able to and did secretly use Highline's credit card and checking account to pay for L & M's purchases from ABC.

48. To the best of Highline's knowledge after diligent investigation, L & M never paid ABC for any of its purchases.

49. As a result of the Schwabs' scheme to have Highline pay for L & M's materials purchased from ABC, Highline could not pay its bills as they became due and became hopelessly insolvent in early 2017 and by the end of 2019 Highline was "out of business."

50. One of the bills left unpaid was Akin's compensation, including his $1,500 per week salary, his vehicle payments, and his health insurance.

## V.   CLAIMS AND CAUSES OF ACTION

**CLAIM 1:  SUIT FOR DECLARATORY JUDGMENT UNDER TEXAS CIVIL PRACTICE AND REMEDIES CODE - CHAPTER 37.**

51. Plaintiff incorporates all the above factual allegations and referenced exhibits into this Claim 1 as though fully set forth herein.

52. Pursuant to the Texas Declaratory Judgment Act and after any required election of remedies, Plaintiff requests that the Court enter judgment in favor of Plaintiff

Akin declaring, contrary to the claims by ABC, that Akin has no liability under the alleged guarantee because it was forged.

53. Akin further requests that he be granted such other relief to which he justly may be entitled as provided by the Texas Declaratory Judgment Act, with such further relief to include but not be limited to judgment in Akin's favor for his reasonable and necessary attorney's fees incurred in pursuing this claim.

## CLAIM 2: SUIT FOR DECLARATORY JUDGMENT UNDER THE FEDERAL DECLARATORY JUDGMENT ACT

54. Plaintiff incorporates all the above factual allegations and referenced exhibits into this Claim 2 as though fully set forth herein.

55. Pursuant to the Federal Declaratory Judgment Act and after any required election of remedies, Plaintiff Akin requests that the Court grant Plaintiff judgment under the Federal Declaratory Judgment Act declaring that Akin has no liability under the alleged guarantee because it was forged.

56. Defendant ABC contends that Plaintiff Akin is liable for alleged unpaid obligations as a personal guarantor of Highline account with ABC, even though ABC has knowledge of Akin's claim that the guarantee is forged but has no evidence other than the forged signature that Akin obligated himself for the payment or that Highline received any benefit from the sales of product to L & M.

## CLAIM 3:  SUIT FOR DAMAGES UNDER THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT, CHAPTER 24 OF THE TEXAS BUSINESS AND COMMERCE CODE ("TUFTA")

57. Plaintiff incorporates all the above factual allegations and referenced exhibits into this Claim 3 as though fully set forth herein.

58. For purposes of TUFTA, Akin alleges that the knowledge of Mark Schwab, as general manager of Highline, is imputed to Highline.

59. At the time of each and all the transfers at issue Akin was both a present and future creditor as those terms are used TUFTA and has standing to bring these claims and he is currently a creditor and at all relevant times since the transfers at issue has remained a creditor who is owned substantial unpaid compensation.

60. TUFTA §24.005 provides:

> *(a) A transfer made, or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation :*
>
> > *(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or*
> >
> > *(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:*
> >
> > > *(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or*
> > >
> > > *(B) intended to incur or believed, or reasonably should have believed, that the debtor would incur, debts beyond the debtor's ability to pay as they became due.*

61. The transfers to ABC described herein were fraudulent as to Akin under TUFTA §24.005(a)(1) because his compensation claims arose before or within a reasonable time after Highline made the transfers to ABC and the transfers to ABC were with and actual intent to hinder, delay or defraud Akin.

62. Alternatively, the transfers to ABC described above were fraudulent as to Akin under §24.005(a)(2) since they were made without Highline receiving a

reasonably equivalent value for the transfers and Highline was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to that business or transaction or, Highline believed, or reasonably should have believed, that it would incur debts beyond its ability to pay them as they became due.

63. TUFTA Section 24.006(a) provides:

> *A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.*

64. The transfers at issue are fraudulent to Akin under TUFTA Section 24.006(a) because: (i) Akin's compensation claim arose before the transfers at issue were made, (ii) Highline did not received reasonably equivalent value for any of the transfers to ABC for L & M's purchases and (iii) Highline was insolvent at the time the payments at issue were made to ABC or became insolvent as a result of the payments.

65. were concealed from Can Capital Asset Servicing, Inc., the assignee of a business loan made to Highline by WebBank and subject to Akin's personal guarantee.

66. Plaintiff Akin was a creditor at the time of the transfers. Highline owed him back salary and benefits and Akin is jointly liable with Highline for least some of Highline's obligations to Can Capital Asset Servicing, Inc.

67. Defendants Mark Schwab and Lynn Schwab and L & M, at the time of the transfers, were affiliates of the Debtor as defined in TUFTA 24.002(1) and "insiders" as defined in TUFTA 24.002(7).

68. As a result of the above-described transfers the Court may award Akin costs and attorneys' fees as are just pursuant to TUFTA Section 24.013. Akin has incurred attorneys' fees and costs in pursuing claims the described herein and Akin requests such an award of attorneys' fees and costs.

G. CLAIM 4: NEGLIGENCE AND GROSS NEGLIGENCE

69. Plaintiff incorporates the above allegations of fact as though fully set forth herein.

70. As a principal in Highline and as an alleged guarantor on Highline's credit application submitted to ABC, ABC owed a duty of ordinary care to Akin.

71. ABC breached that duty of ordinary care, a breach that proximately caused damages to Akin including but not limited to the loss of compensation and severe emotional distress.

72. ABC had and has actual notice that the alleged signature of Akin on the credit application was fraudulently forged, but notwithstanding that knowledge has threatened to pursue collection actions against Akin if Akin pursues any claims against ABC, whether individually or on behalf of Highline.

73. Based on information and belief ABC has no credible evidence that Akin signed the guarantee.

74. Viewed objectively from the standpoint of ABC with consideration for the magnitude and probability of harm to others, specifically including Akin, there

was a likelihood that Akin would suffer severe injury including but not limited to financial ruin.

75. ABC had actual subjective awareness of the risk to others including Akin, but nevertheless proceeded with a conscious indifference to the risks of harm posed by the scheme described above.

76. For the negligence and gross negligence of ABC, Akin seeks recovery of his actual damages proximately caused by ABC's negligent conduct and further seeks recovery of exemplary damages for ABC's gross negligence.

### VI.   RELIEF REQUESTED WITH JURY DEMAND

77. Plaintiff incorporates the above requested relief as if fully set forth herein, and requests that this case be tried by jury with respect to any contested issues of fact.

78. Plaintiff further requests that after any required election of remedies that judgment be entered against Defendant American Builders and Contractors Supply Company, Inc. *d/b/a* "ABC Supply Co.":

    (a) declaring that Plaintiff Akin's purported signature on the Highline credit agreement with ABC was forged without Akin's knowledge, consent, or ratification and that Akin is not liable under that alleged guarantee under the Texas Declaratory Judgments Act;

    (b) declaring that Plaintiff Akin's purported signature on the Highline credit agreement with ABC was forged without Akin's knowledge, consent, or ratification and that Akin is not liable under that alleged guarantee under the Federal Declaratory Judgments Act;

(c) avoiding the transfers described herein and ordering those funds be repaid to Highline with interest and granting Akin a first lien on those funds to the extent of his unpaid compensation claim plus pre and post judgment interest as allowed by law.

(d) awarding Akin actual and exemplary damages for ABC's negligence and gross negligence;

(e) awarding Akin his attorney's fees to the extent such fees were reasonable and necessary and allowed by law;

(f) awarding Akin his reasonable litigation expenses and taxable costs incurred in obtaining his judgment as allowed by law; and

(g) granting Akin all further relief, whether legal or equitable, general, or special, to which Akin may show himself justly entitled.

RESPECTFULLY SUBMITTED,

/s/*Frank L. Broyles*

Frank L. Broyles
Texas Bar No. 03230500
600 E John Carpenter Frwy
Ste 287
Irving, TX 75062
(214) 207-4336
**ATTORNEY FOR PLAINTIFF**